**Brenda Ann SCOTT**

v.

**The STATE of Texas, Appellee.**

No. 522–86.

Court of Criminal Appeals of Texas,
En Banc.

June 10, 1987.

James H. Anderson, Dallas, for appellant.

John Vance, Dist. Atty., and Donald G. Davis, Marston Alexander and Mark Nancarrow, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

ONION, Presiding Judge.

Appellant was convicted by a Dallas County jury of first degree murder. V.T.C.A., Penal Code, § 19.02(a)(1). The indictment alleged that appellant on or about April 9, 1981, "knowingly and intentionally" caused the death of her son, Russell Scott, by striking him "with her hand and by manner and means unknown to the Grand Jurors." The trial court sentenced appellant to 25 years' imprisonment. Appellant appealed her conviction to the Court of Appeals, alleging in two points of error that the evidence was insufficient to support her conviction. A panel of the Court of Appeals, in an unpublished opinion, with one justice dissenting, agreed with appellant's contentions and reversed the judgment of the trial court. *Scott v. State* (No. 05–84–00109–CR, delivered January 23, 1986). The cause was remanded to the trial court with instructions to enter an order of acquittal under *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). We granted State's petition for discretionary review to determine whether the Court of Appeals incorrectly concluded that no corpus delicti was established.

The record reflects that on April 9, 1981, L.D. "Bo" Pitts became ill at work and returned home around 9:00 a.m. He lived in the Meadow Creek Apartments in Dallas. When Pitts arrived he noticed flames coming out of the second floor window of a studio apartment, and immediately ran to the manager's apartment to report the fire. After calling the fire department Pitts ran back to the burning apartment, where he discovered appellant sitting on the steps holding her oldest son Thomas Scott, Jr.

Pitts testified that appellant was crying and saying: "My baby, my baby." Appellant continued to cry when Pitts asked whether another child was trapped upstairs. Pitts tried to run upstairs, however, the strong smoke and flames prevented him from reaching the bedroom. He succeeded in getting appellant and her son out of the apartment with the help of a neighbor, and informed the fire chief that a child might still be upstairs. According to Pitts, no one else was in the apartment except appellant and her son, Thomas.

Mary Hart, the apartment manager, testified that appellant lived in apartment #135 with her husband and two children. Russell, the deceased, was two years old at the time. Hart stated that on three different occasions she heard appellant scream at Russell using very loud profanity. On the morning of April 9, 1981, Hart was notified by Pitts of the fire in appellant's apartment. Hart ran up to the apartment and urged appellant to get her children and get out of the apartment. Hart later spoke with appellant, and related the following: "Well, she [appellant] said, 'Russell's gone, Russell's gone,' and she was crying very hard. And then she asked me if there was anything left of the baby." Hart also noted that appellant's husband was contacted at work by another apartment manager, and that he arrived at the scene about 30 minutes later. On cross-examination Hart agreed that appellant was "crying and hysterical," but that her husband, Thomas Scott, Sr., "wasn't as upset as she was."

Captain Donald Benda, an investigator with the Dallas Fire Department, testified that he arrived on the scene at approximately 9:20 a.m. on April 9, 1981. Benda was notified that there was a casualty and he described what "appeared to be a young child, approximately two to three years old, and was severely burned, the extremities burned off, and deeply charred." Samples of burned debris were taken from the room "at a later date" to determine if any accelerant was used to enhance the fire.[1] According to Benda, no residue of any type of flammable liquid was detected,[2] although flammable lighter fluid, gasoline, and insecticide were found in the apartment. It was Benda's opinion that the fire had "an intensity of unusual proportion in the area that could have been caused by an accelerant." His opinion was based on burn patterns on the floor and wall of the bedroom, which indicated that the fire had been set intentionally with some form of accelerant. Benda identified a photograph which indicated the fire had a higher intensity in the vicinity where the crib was located and where the body was found. Benda also found it unusual that there was no clothing in the closet of the bedroom where the body was found. All accidental causes were ruled out due to the way the fire burned. It was also Benda's personal opinion was that "the fire was probably intentionally set to conceal the death of Russell Scott." Nevertheless, no arson complaint was ever filed against appellant.

Fannie Parks, a friend of the appellant, testified that she babysat for appellant's children on many occasions. She testified that appellant seemed "distant" toward her youngest son and "she would always say that he was a bad child and he was stubborn or he rolled his eyes a lot and she said he was just plain mean." Parks noticed scars all over the body of the deceased, and voiced her concern to the appellant, as well as the child welfare department. With respect to appellant's treatment of the deceased, Parks testified as follows:

"Q. Mrs. Parks, let me ask you if during the time that you were with Brenda and her children, did she ever—did you ever see her scream at Russell?

---

1. As noted by the Court of Appeals, the record provides no explanation as to why Captain Benda waited several days before he took the samples to test. In the meantime, the apartment had been cleaned and the debris removed.

2. Benda testified that it was not unusual to find an absence of accelerant residue because an intense fire will often burn off all flammable liquids and any residue. There is also a chance that such residue will be thrown out during cleanup or that the amount of flammable liquid used may be too small to soak into any wood structure. Benda testified that the fire in the second story bedroom was "extremely intense."

"A. Yes.

"Q. Did you ever hear her make threatening remarks regarding Russell?

"A. Yes.

"Q. Would you tell the members of the jury what those threatening remarks were that she made to Russell Scott?

"A. She would always say that 'One of these days, you're going to make me kill you.'

"Q. 'One of these days, you're going to make me kill you.'

"A. Uh-huh.

"Q. Did she say that in your presence to him few or many times?

"A. Many times."

Parks also testified that on April 2 she babysat the deceased and while changing his diaper noticed bruises "from the base of his neck to the bottom of his booty," which looked old, but were light purple and pink colored.

On cross-examination Parks agreed that appellant had complained of her husband's brutality toward her and the children.

Doris Davis also testified that she used to babysit for appellant's children. She stated that appellant acted as if she did not love the deceased and "always treated the oldest one better than she did the youngest one." Davis related an incident in which she and appellant went to a restaurant during the July 1980 heat wave in Dallas, and that appellant left the deceased in the car with the windows rolled up for 45 minutes or more. Also in 1980, Davis observed appellant having problems "potty training" the deceased, and as a result appellant threw the child up the stairs and then back down the stairs. Just as Fannie Parks had testified, Davis acknowledged that appellant said to the deceased: "You're going to make me kill you." Davis also explained that she once observed appellant combing the deceased's hair with a "cake cutter," and that she was hitting him in the head with it. Together, Davis and Parks con-

tacted a mutual friend, Theola Franklin, who called the child welfare department.

Linda Lydia, a social worker for the Texas Department of Human Resources, testified that during her four visits to the Scott family there was "really no interaction" between appellant and the deceased, "whereas there was quite a bit [of interaction] between [appellant] and the older child." Lydia observed the deceased to be very quiet and withdrawn, and noticed the scars on his body. Lydia also testified that the deceased was taken to Chester Clinic in November and December of 1980, and that x-rays were taken of the child's back and chest. According to Lydia the x-rays were "negative." [3]

Dr. Patrick Besant-Matthews, medical examiner for Dallas County, conducted an autopsy on the deceased on April 9, 1981, and testified that the body was "severely burned," thus "completely obliterat[ing] any findings that there might have been on the skin." An internal examination of the body revealed no evidence that the child was alive at the time the fire started. Dr. Besant-Matthews explained:

"That is to say there was no soot in the windpipe which would have been breathed in if the child had been breathing at the time the fire was burning, and the chemistry lab further confirmed this in that there was no carbon monoxide in the blood which you would expect for somebody who had been breathing fire fumes."

The autopsy revealed a relatively recent fracture of the right thigh bone (femur). It was determined that this fracture occurred prior to the child's death, because there was some blood in the soft tissues adjacent to the fracture. There was no evidence of any healing; the bone was "just broken ends." Old healing fractures were also discovered on the left seventh and eighth ribs and the third thoracic vertebra of the back. The medical examiner could tell those fractures were of some age

---

**3.** Dr. Munir Bishara, a rebuttal witness, testified that the deceased was referred to him by the Child Welfare Association. On November 18, 1980, he took x-rays of the deceased to deter-

mine whether he had been the victim of child abuse. The x-rays were "negative" in that they did not reflect any fractures, old or new.

due to a bumpy mass of new bone which had formed around the breaks. Doctor Besant-Matthews concluded: "So therefore I had three principal findings, evidence that the child was not dead—was not alive at the time the fire began and evidence of a recent injury and evidence of [an] old injury in three separate bones."

Dr. Besant-Matthews also testified that all of the injuries found were capable of being made by striking the body of the deceased with a hand. Although the doctor could not determine the exact cause of death, he did classify the death as a homicide. He noted: "[The deceased] has previously been injured, and this suggests to me that his death is caused by an outside agency, by another person."

On cross-examination Dr. Besant-Matthews reiterated that he could not determine the exact cause of death due to the extensive damage to the body caused by the fire. Although the medical examiner speculated that some form of violence was involved in the child's death, he could not rule out "some subtle cause of death ... such as asphyxia." Still, the doctor had no reason to believe the death was natural, due to the evidence of prior injuries. He concluded: "I have no idea what the circumstances were surrounding the fire. I have also stated that I don't know the exact cause of death."

The State also called Joseph Hathaway to testify that he served as the assistant foreman on the Dallas County Grand Jury. He stated that the grand jury heard testimony from members of the Dallas Police Department, but could not determine the manner and means of the death of Russell Scott. The case was "held" for approximately two weeks to wait for the testimony of Dr. Besant-Matthews. However, even Dr. Besent-Matthews' testimony did not provide the grand jurors with enough information to determine the manner and means of death.

The defense produced several witnesses who testified that appellant was a fit mother and that her husband Thomas had a violent temper. Helen Harden, appellant's sister, testified that she had never seen appellant strike the deceased, although she had heard her scream at him. Harden described Thomas Scott, Sr. as "an alcoholic, a drug user," and as being violent. She also stated that she had observed him abuse the children. Harden could not explain the scars on the deceased's body as portrayed in photos taken by the Child Welfare Association.

Iodelthia Harden, appellant's sister-in-law, stated that Thomas Scott, Sr. "had a Dr. Jekyll and Mr. Hyde personality." She also recalled instances in which he used violence against appellant and the children.

Appellant's mother, Vera Mae Harden, testified that her daughter "always loved kids," but that her husband would get violent and impatient with the kids," he would "slap them around." Harden testified: "I observed him [Thomas, Sr.] picking them up, chunking them in the bed, grab them by their limbs, just chunking them around for no reason at all, slapping them side the head." Harden did not believe Thomas, Sr. was a fit parent.

Appellant's husband did not testify.

After hearing closing arguments from the State and the defense, the jury returned a verdict of guilty.

This case is admittedly a circumstantial evidence case. This Court has held that the standard for review in *both* direct and circumstantial evidence cases is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Houston v. State*, 663 S.W.2d 455, 456 (Tex.Cr.App.1984) (On Appellant's Motion for Rehearing); see also *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Sutherline v. State*, 682 S.W.2d 546, 548–49 (Tex.Cr.App.1984); *Jackson v. State*, 672 S.W.2d 801, 803 (Tex.Cr.App.1984); *Wilson v. State*, 654 S.W.2d 465, 471 (Tex. Cr.App.1983) (On State's Motion for Rehearing). Also, in both direct and circumstantial evidence cases, the reviewing court will look at *all* the evidence in the light most favorable to the verdict or judgment. *Houston*, supra, 663 S.W.2d at 456.

Prior to 1974 several Texas courts had held that the corpus delicti in a murder prosecution consisted of three elements: (1) the body of the deceased must be found and identified; (2) the death of the deceased must be shown to have been caused by the criminal act of another; and (3) the accused must be shown to have been the guilty agent connected with the criminal act. See *Self v. State*, 513 S.W.2d 833, 834 (Tex.Cr.App.1974) (and cases cited therein). However, in *Self*, supra, this Court decided that the above three-part definition was "obviously too broad," and therefore excluded the third element requiring a specific showing that the accused was the guilty agent connected with the criminal act. See also *Streetman v. State*, 698 S.W.2d 132, 135 (Tex.Cr.App.1985). "Corpus delicti strictly speaking means actual comission of a crime and someone criminally responsible therefor and proof of the defendant's connection with such crime is not part of the corpus delicti." *Troncosa v. State*, 670 S.W.2d 671, 680 (Tex.App.-San Antonio, 1984, no pet.) Although connecting the accused to the crime of murder is no longer an element of the corpus delicti of murder, it is an element of the offense of murder which the State must prove beyond a reasonable doubt. See *Streetman*, supra, 698 S.W.2d at 135.

In determining whether the corpus delicti was established in this case, we begin by finding there is no question that the body discovered in apartment # 135 was that of Russell Scott, appellant's youngest son. We must next determine whether his death was caused by criminal means.

As previously discussed, the evidence showed that the deceased was both verbally and physically abused by appellant on several occasions prior to his death. Witnesses testified about scars they had seen on the child's body and photographs taken on November 18, 1980, by Joella McLean of the Texas Department of Human Resources confirmed this fact. Doris Davis related an incident in which appellant purposely left the deceased in a car with the windows rolled up in extreme summer temperatures for approximately 45 minutes or more. Davis also saw appellant throw the deceased up a flight of stairs and then back down the stairs of her studio apartment. The child welfare department was contacted as a result of appellant's brutal behavior toward her child.

Dr. Besant-Matthews testified that the deceased was not alive at the time the fire started, since there was no soot or carbon monoxide in the child's body. The doctor theorized that Russell Scott's death was "caused by an outside agency," based on the evidence of prior injuries. The blood still present in the soft tissues surrounding the fractured right femur, indicated the bone had been broken relatively soon before death. Although the medical examiner could not determine the exact cause of death, he suspected that some form of violence was involved.

It has been written that opinion evidence is not the only mode of establishing the cause of the decedent's death, and that circumstantial evidence may fully suffice for this purpose. See 29 Tex.Jur.2d, Homicide, § 180, p. 282; see also *Boone v. State*, 689 S.W.2d 467, 468 (Tex.Cr.App.1985); *Hines v. State*, 515 S.W.2d 670 (Tex.Cr.App.1974); *Morris v. State*, 322 S.W.2d 632 (Tex.Cr.App.1959); *Peterson v. State*, 630 S.W.2d 677, 678 (Tex.App.-Houston [1st] 1981, no pet.). We have held that the corpus delicti of a homicide may be established by circumstantial evidence. *Easley v. State*, 564 S.W.2d 742, 749 (Tex.Cr.App. 1978); *Madden v. State*, 171 Tex.Cr.R. 80, 344 S.W.2d 690, 692 (1961). "It is not essential that every fact point directly and independently to the guilt of the accused, and the *cumulative force of all the incriminating circumstances may be sufficient to support the guilty verdict.*" (Emphasis supplied) *Gonzales v. State*, 681 S.W.2d 270, 273 (Tex.App.-San Antonio 1984, no pet.); see also *Carlsen v. State*, 654 S.W.2d 444, 447 (Tex.Cr.App.1983).

In *Layne v. State*, 54 Ala.App. 529, 310 So.2d 249, 254 (1975), the Court of Criminal Appeals of Alabama held that "evidence of recent abuse to the deceased child by defendant would be admissible to show intent, motive or scienter." See also *Harris v. State*, 489 So.2d 688, 689 (Ala.Cr.App.

1986). The indictment in *Layne* charged the defendant with killing her three-year-old daughter "by some means unknown to this Grand Jury." There was evidence that the child had been badly abused prior to having hot water thrown onto her by the defendant. A doctor had testified to the Grand Jury that the primary cause of death was from a combination of pneumonia and shock lungs which were secondary to the child's burns. It was held:

> "Testimony from the physicians in this case is sufficient for a jury to consider that death resulted from a chain of events, i.e. abuse of the child, culminating with the final act of brutality which triggered the causative factors of her death, pneumonia and shock lungs." *Layne*, supra, 310 So.2d at 254.

Also in 1975, the Court of Criminal Appeals of Alabama decided *Smith v. State*, 54 Ala.App. 237, 307 So.2d 47, 48 (1975), which involved the death of a child due to "brain damage and hemorrhage associated with a blow to the head." A doctor testified that the injury probably did not naturally occur in the sense that it could not have been self-inflicted by a child too young to walk or crawl. The Court noted there was substantial evidence establishing criminal agency and held, "the prosecution met its burden of proof in showing that the victim died because he was killed as opposed to dying from natural or accidental causes." *Smith*, supra, at 49.

Yet another Court of Criminal Appeals, this one in Tennessee, has held that the cause of death need not be scientifically proven in every case. *Berry v. State*, 523 S.W.2d 371, 374 (Tenn.Cr.App.1974).

■ We are persuaded that the cumulative factors present in the instant case are sufficient to support the guilty verdict. The prior abuse of the child, coupled with the recent injury to the right femur and the fact that the child died before the fire was set all indicate that the deceased did not die a natural death. There was also ample evidence to show that the fire had been intentionally set to cover up the child's death. This circumstance is supported by the fact that accelerants had been used to enhance the fire and because clothing had been removed from the closet before the fire was started, presumably to prevent their destruction.

■ It is immaterial that the exact cause of death could not be determined. The indictment alleged that appellant caused the death of her son by striking him "with her hand and by manner and means unknown to the Grand Jurors." The medical examiner testified that all injuries suffered by the deceased could have been inflicted by being struck with a hand. Furthermore, the assistant foreman of the grand jury testified that even after listening to the testimony of the medical examiner, the grand jury did not have enough information to determine the manner and means of death. "When an indictment alleges that the manner and means utilized to inflict an injury is unknown, and the evidence at trial does not show what type of object was used, a prima facie showing exists that the object was unknown to the grand jury." *Washington v. State*, 677 S.W.2d 142, 145 (Tex.App.-Dallas 1984); see also *Allen v. State*, 651 S.W.2d 267, 270 (Tex.Cr.App. 1983); *Cunningham v. State*, 484 S.W.2d 906, 911 (Tex.Cr.App.1972); *Brown v. State*, 704 S.W.2d 506, 508 (Tex.App.-Dallas 1986, PDR refused); *Carey v. State*, 695 S.W.2d 306 (Tex.App.-Amarillo 1985). There was sufficient evidence to show death by criminal means, thus establishing the second element of the corpus delicti.

We are not persuaded to a contrary holding by the single comparison case cited by the Court of Appeals, *Jackson v. State*, 652 S.W.2d 415 (Tex.Cr.App.1983). In *Jackson* we held that sufficient evidence was present to corroborate the confession and establish that the defendant struck the child. However, a more difficult question was presented regarding the actual cause of death. The State failed to prove that the elbow blows confessed to by the defendant caused the hemorrhage which ultimately resulted in the child's death. "Absent a clearer indication that the child's death was caused by a blow or blows delivered from appellant's elbow, the state has

**360**

presented insufficient evidence to support the conviction." *Jackson,* supra, at 419.

The indictment in *Jackson* alleged that the defendant knowingly and intentionally caused the death of her daughter "by striking the child on the head with her elbows." When the State failed to prove that the blows from Jackson's elbows ultimately caused her daughter's death, there was insufficient evidence to support the conviction. In the instant case the indictment alleged alternative theories, namely "striking the said Russell Scott with her hand and by manner and means unknown to the Grand Jurors." Proof of either of these means is sufficient. See *Helmus v. State,* 397 S.W.2d 437 (Tex.Cr.App.1965) (An indictment alleging in the same count that the defendant killed the deceased by striking him with his hand and "in some manner and by some means, instrument or weapon to the grand jury unknown," was upheld.) See also *Garrett v. State,* 682 S.W.2d 301, 309 (Tex.Cr.App.1984); *Zanghetti v. State,* 618 S.W.2d 383, 386–87 (Tex.Cr.App.1981); *Vaughn v. State,* 607 S.W.2d 914 (Tex.Cr. App.1980); *Brantley v. State,* 522 S.W.2d 519 (Tex.Cr.Ap.1975).

The Court of Appeals concluded its analysis in this case when it determined the evidence was insufficient to establish a death by criminal means. The Court of Appeals noted: "It is then unnecessary for us to determine whether the evidence is sufficient to further establish that the appellant was the guilty agent causing the death." This issue needs to be determined by the Court of Appeals.

The judgment of the Court of Appeals is reversed and cause remanded to answer the above described issue and appellant's other point of error.