Edward Ernest GRAF, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 10–88–137–CR.

Court of Appeals of Texas,
Waco.

Dec. 31, 1990.

Charles M. McDonald and Lynn W. Malone, McDonald, Harmon and Malone, Waco, for appellant.

Paul E. Gartner, Jr., Crim. Dist. Atty. and Tanya Boyce Dohoney, Asst. Dist. Atty., Waco, for appellee.

Before THOMAS, C.J., and MEANS, J., and VIC HALL (Retired), J.

## OPINION

THOMAS, Chief Justice.

On August 26, 1986, Appellant's two adopted sons, Jason and Joby, died in a fire in a storage shed behind their residence. Appellant was convicted of the capital murder of Jason, but received a life sentence rather than the death penalty. *See* TEX. PENAL CODE ANN. § 19.03 (Vernon 1989). His conviction rests entirely on circumstantial evidence. The principal complaint is that the evidence was insufficient to support his conviction. The judgment will be affirmed.

Evidence is sufficient to support a conviction when, viewing it in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Butler v. State*, 769 S.W.2d 234, 238 (Tex.Crim.App.1989). This is the standard of review for either direct or circumstantial evidence. *Id.* However, circumstantial evidence must exclude every reasonable hypothesis except that of the defendant's guilt. *Beardsley v. State*, 738 S.W.2d 681, 685 (Tex.Crim.App.1987). Eliminating all reasonable hypotheses other than the defendant's guilt is not a different test for sufficiency, but is merely an analytical tool used to facilitate the standard of review. *Butler*, 769 S.W.2d at 238 n. 1. All of the evidence must be considered in determining whether the state has met its burden of proving each element of the offense beyond a reasonable doubt. *Id.* at 239.

Appellant first contends under point one that the circumstantial evidence did not exclude the reasonable hypothesis that the children started the fire accidentally. Thus, he argues that the evidence was insufficient to support his conviction because no rational trier of fact could have found beyond a reasonable doubt that a crime was committed.

"Corpus delicti" has two elements in a murder prosecution: (1) the body of the deceased must be found and identified; and (2) the death of the deceased must be shown to have been caused by the criminal act of another. *Scott v. State*, 732 S.W.2d 354, 358 (Tex.Crim.App.1987). Circumstantial evidence can be used to establish either element. *Id.* Undisputed evidence established that the bodies found in the debris were those of Jason and Joby. However, Appellant attacks the sufficiency of the circumstantial evidence to prove the second element, i.e., that a criminal act occurred.

Shortly before 5:00 P.M. on August 26, 1986, Tom Lucenay, deputy chief of the Hewitt Volunteer Fire Department, noticed light-colored smoke which appeared to be from a grass fire near his home. He ran into his house to get his fire department "walkie-talkie" to report the fire. By the time he returned to his front door, the smoke had changed color to "dark black" and there were "bright orange flames." Lucenay used the walkie-talkie to report a "structure fire" in his neighborhood. While running from his home towards the fire, he heard a couple of "small explosion sounds."

When Lucenay arrived at the scene of the fire, he saw a storage shed engulfed in flames in the back yard of Appellant's residence. He described the fire, which had flames twelve to fourteen feet high, as burning "fast" and "very hotly." Other firemen gave similar descriptions of the fire. Lucenay at first was unable to get into the back yard because the gate of the privacy fence was "chain locked." One of Appellant's neighbors found the other entry to the back yard "tied shut with a rope." While Lucenay and the neighbor were attempting to pull up fence posts to gain entry, Appellant, who was holding an

infant, appeared and helped them by kicking through some slats in the privacy fence and pulling down the gate post.

Firemen first learned that Appellant's two sons were missing when the fire was at a "smoldering stage." They were preparing to search the neighborhood for the boys when the bodies of the children were discovered in the shed's debris. A fireman took photographs of the scene which were later examined by two arson investigators. Joby's body was found near the shed's two front doors while Jason's body was lying in a rear corner of the shed. Both bodies were lying face-up, "looked relaxed," and neither child appeared to have been trying to protect or shield his facial area from the heat.

After the fire was extinguished, Lucenay expressed his condolence to Appellant and his wife, and "out of a sense of compassion" offered to remove the burned debris from the back yard. At first Appellant was undecided, but several minutes later he told Lucenay to remove "everything burned." After police and fire officials gave their approval, Lucenay and several firemen returned later that night and used a front-end loader and a dump truck to remove what was left of the shed. After the shed was removed and Lucenay returned home, he recognized that he had made a "mistake" in removing the debris before a complete investigation was made to determine the cause of the fire and the manner of the children's deaths. What disturbed Lucenay most was that he suddenly remembered seeing a gas can sitting on Appellant's back-yard patio and recognized that the "quick, hot fire" had characteristics associated with the use of an accelerant. Three other people also noticed a gas can sitting on the patio while they were at the scene.

A pathologist who performed autopsies at the funeral home concluded that both boys died as a result of asphyxia due to smoke inhalation and severe burns. He found no evidence of any other trauma. A "drug scan" was negative, except for a non-prescription antihistamine in Jason's blood. However, the high level of carbon monoxide in their blood and the amount of soot found in their throat and lungs indicated that both children were alive when the fire started and that their deaths were not instantaneous. These findings were confirmed by a second autopsy in Dallas after the bodies were exhumed. The pathologist who performed and supervised the second autopsies found no evidence that the boys had been tied up, but acknowledged that intense heat can destroy evidence and that poisonous gases emitted from fires can quickly render a person unconscious.

Joseph Porter, an arson investigator for the Texas Fire Marshall's Office, began his investigation eight days after the fire. He viewed the burned debris at a gravel pit where it had been dumped, examined the dirt in Appellant's back yard where the shed had been located, studied photographs of the scene of the fire, reviewed reports of the first autopsies, had the bodies exhumed for a second autopsy, attended the second autopsy, and gathered information from witnesses. Porter also obtained a photograph of the shed before its destruction from Appellant.

By examining "burn patterns" and "pour patterns" shown in the photographs taken at the scene, Porter determined that the fire originated in the front, left corner of the shed and that some type of accelerant was used to enhance the fire. Although burn patterns indicated that a plastic can containing gasoline was located inside the shed near the left-front door, he said that gasoline from the gas can or spillage from two lawnmowers and a "weed-eater" found in the debris could not account for the amount of accelerant used or the distinctive pour patterns found on the shed's plywood floor and floor joists. Moreover, burn patterns on the hinges and the shed's double doors indicated that they were closed during the fire.

Porter said that the positions of the bodies made the fire "suspicious" because "it is almost unheard of to find two bodies

face up if both victims were awake and alert at the time of the fire." He explained that fire victims, if they are conscious and alert when the fire is burning, are usually found in a position trying to protect their face from the intense heat and smoke. Unburned portions of their buttocks indicated that the boys were both lying on their backs throughout the fire. Porter noted that the second autopsies, although revealing soot in the air passages, did not show any burns in the lungs. He said that the boys, who were at least four-feet· tall, would have suffered burned lungs if they had stood up and inhaled the 400 degree heat at any time during the "free burning stage" of the fire. The absence of any burning in their lungs indicated that neither child had stood at any time while the fire was burning.

Based on his investigation, Porter believed that the fire was intentionally set and that the crime of arson was committed. Finding the double gates to Appellant's back yard "tied shut with a rope" and the single gate "chain locked" indicated arson, Porter stated, because an arsonist will try to make entry to the scene of the fire as difficult as possible.

Charles King, a New York arson investigator, examined the photographs that Porter had used to reach his conclusions. However, he used computer-enhanced enlargements of several of the photographs, which allowed him to see minute details of burn and pour patterns in the debris. Basing his opinion on the photographs, King found that the fire was intentionally set, that an accelerant was used, and that both front doors of the shed were closed during the fire. His most interesting discovery was that there were actually two separate fires inside the shed, approximately nine feet apart, both intentionally set and enhanced by an accelerant. Porter had suspected that there were two separate fires, but could not confirm his suspicion with the unenhanced photographs. King's opinion was that there was no reasonable explanation for both bodies being found face-up, and that the boys were "unconscious or incapacitated" *before and all during the fire,* which meant that they could not have

accidentally started it. Like Porter, he said that simultaneous leakage of gasoline from the lawnmowers and weed-eater could not explain the amount of accelerant used or the distinctive pour patterns of the two widely separated fires. Based on the burn and pour patterns, King said that the accelerant must have been on the floor at least thirty minutes before it ignited to penetrate the shed's plywood floor and floor joists. He stated that all of the evidence indicated that the boys did not accidentally set the fires.

■ Thus, two arson experts testified that the fire was deliberately set by means of an accelerant. King's opinion was that the children could not have accidentally started the fire because they were unconscious both *before and during the fire.* Logically, if they were unconscious before the fire ignited, then they could not have started it accidentally. Some other person must have intentionally set the fire. When viewed in the light most favorable to the verdict, the cumulative force of the circumstantial evidence excluded the hypothesis that the children accidentally set the fire, and was sufficient for the jury to have found beyond a reasonable doubt that the fire resulted from a criminal act. *See id.* at 359. Thus, the evidence was sufficient for the jury to have found the second element of corpus delicti beyond a reasonable doubt.

Appellant also argues under point one that the evidence was insufficient to prove beyond a reasonable doubt that· he was responsible for setting the fire. Although establishing Appellant's criminal agency was not an element of corpus delicti, the State nevertheless had to prove beyond a reasonable doubt that he was responsible for the criminal act to obtain a conviction. *See id.* at 358. His criminal responsibility could be established circumstantially. *Id.*

■ Any supposition that someone other than Appellant started the fire was not reasonable under. the circumstances proven because it was "out of harmony with the evidence." *See Vaughn v. State,* 607 S.W.2d 914, 921 (Tex.Crim.App. [Panel Op.]

1980). First, after eliminating the hypothesis that the children were responsible for starting the fire, the circumstances proved that Appellant was the only other person present who could have set it. That fact alone would not support his conviction, but was a circumstance that tended to establish his guilt when combined with other facts. *See Johnson v. State,* 537 S.W.2d 16, 18 (Tex.Crim.App.1976).

Second, Appellant was the only person with a motive to kill the children, a fact which not only linked him to the crime but excluded the hypothesis that someone else started the fire. *See Harris v. State,* 727 S.W.2d 537, 542 (Tex.Crim.App.1987). Witnesses described his treatment of the boys as strict, cold, and without love or affection. Some of his actions at the scene of the fire were described as particularly inappropriate and unfeeling. His actions at the funeral home—where he not only suggested the two bodies be buried in the same casket, apparently to save money, but tried to prevent the boys' portrait from being placed between their caskets at the funeral service—was evidence of his enmity toward his adopted sons.

Despite this estranged relationship, Appellant purchased separate $25,000 life insurance policies on Jason and Joby just twenty-seven days before the fire, purportedly to provide for their college education. The policies, containing double-indemnity provisions, apparently arrived in the mail at Appellant's home on the day of the fire. Appellant, who was described as "obsessed" with money, thus stood to gain financially from the boys' "accidental" deaths.

Appellant's wife, who was concerned about his harsh treatment of the boys, told him shortly before the fire that she was going to leave and take the children, including their baby, just as soon as school started. Appellant had told others that his marital troubles stemmed from the presence of the two boys in the family unit and that his marriage would improve without them. In fact, he told his wife shortly after the fire that he hoped their deaths would bring them closer together. Thus, Appellant also could have been motivated by the belief that he could save his marriage by eliminating the two boys, the root-cause of his marital troubles.

Third, there was evidence that Appellant knew that *both* boys had died in the fire before he was given that information. After fireman Jim Sutter saw the body of a child in the debris, he entered the house and told Appellant, "We have found *the body of a child.*" (Emphasis added). Sutter then closed the drapes and blinds so that people inside the home could not see the grisly scene in the back yard. However, as Appellant's wife walked into their home, Sutter heard Appellant tell her, "Honey, we have lost *both boys.*" (Emphasis added). Sutter thought that this comment was "odd" because Appellant had not yet been told about a second body.

Finally, the evidence indicated that Appellant made preparations consistent with an intention not only to kill the children but to obliterate any vestiges of their memory. Witnesses described him as a "list-maker," "organized," "meticulous" and "possessive," so possessive, in fact, that he would call friends and relatives looking for his wife if she were only a few minutes late coming from work. Appellant's wife said that he even refused to allow her privacy in the bathroom. However, on the morning of the fire, Appellant encouraged his wife, a teacher, not to rush home that day but to remain at school and prepare her room for the new school year. This was markedly inconsistent with his usual attitude toward her absence from home. Unlike prior years, when Appellant would suggest that the boys' school clothes and supplies be bought well in advance of the beginning of the school year, he uncharacteristically resisted doing that in August 1986, even though the new school year was about to begin. When his wife nevertheless insisted on buying the boys' school clothes, Appellant refused to allow the store's tags to be removed from the clothing and required the clothes to be kept in the original bags. Shortly after their deaths, he returned the new clothes to the store and received a credit on the charge account. Appellant was so organized and such a list-maker

that he would purchase the boys' breakfast cereal and Jason's antihistamine medication well in advance of their depletion. However, he did not purchase either the cereal or medicine just before their deaths, despite their near depletion.

Shortly before the fire, Appellant also moved all of his wife's memorabilia of the two boys, including their baby pictures, books, school papers, and other keepsakes, into the shed from a storage area in the carport. Almost all of these items were destroyed in the fire. However, Appellant did not move any of his personal keepsakes into the shed.

■ Every fact did not have to point directly and independently to Appellant's guilt, as the combined and cumulative force of all the incriminating circumstances could establish his criminal agency. *See Beardsley*, 738 S.W.2d at 685. Evidence of his presence at the scene, when combined with the circumstances showing motive, preparation, a gas can which could have contained the accelerant, and personal knowledge of both deaths, was sufficient to exclude the hypothesis that the fire was started by someone other than Appellant and for the jury to have found beyond a reasonable doubt that he was criminally responsible for setting the fire that killed his adopted sons. Thus, the evidence was sufficient to support his conviction because the jury could have found all elements of the offense beyond a reasonable doubt. Point one is overruled.

The court instructed the jury that "a person commits capital murder when the person murders more than one person during the same criminal transaction." Point two is that the court erred when it overruled an objection that the charge did not define the term "criminal transaction."

■ "Criminal transaction" is not defined in the statutes. Generally, the court need not define a term which has not been statutorily defined. *Mosley v. State*, 686 S.W.2d 180, 182 (Tex.Crim.App.1985); *Andrews v. State*, 652 S.W.2d 370, 375 (Tex. Crim.App.1983). However, Appellant argues that the term had to be defined because it is a "term of art" which the legis-

lature intended to have a "specific and technical meaning." Just because a term has acquired a technical meaning does not require its definition. *Andrews*, 652 S.W.2d at 375–76 (failing to define "prurient interest," a term not statutorily defined, was not error although it may have acquired a technical meaning). Instead, the term "criminal transaction" should be read in its context and construed accordingly. *See id.* at 376. The court did not err when it refused to define the term.

■ However, assuming that the term should have been defined, Appellant would be entitled to a reversal only by showing "some harm" from the error. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim. App.1985) (on rehearing). As there was no evidence of more than one criminal transaction, the jury could have understood the term only to mean the fire in the shed. Considering the charge as a whole and in light of the complete record, any error resulting from the failure to define "criminal transaction" would not have contributed beyond a reasonable doubt to Appellant's conviction or punishment. *See* TEX.R. APP.P. 81(b)(2); *Mosley*, 686 S.W.2d at 182. Point two is overruled.

Appellant complains in his final point that the court erred when it refused to instruct the jury on the defenses of "accident" and "voluntariness." He contends the jury should have been instructed to acquit him if there was a reasonable doubt that the children accidentally started the fire or that he acted other than voluntarily. "Accident" is no longer a defense under the Penal Code, and the court did not err when it refused to charge it as such. *See George v. State*, 681 S.W.2d 43, 45 (Tex. Crim.App.1984) (quoting *Williams v. State*, 630 S.W.2d 640, 644 (Tex.Crim.App.1982) (on rehearing)).

■■ An instruction on "voluntariness" now serves the same function as the former instruction on accident. *See id.*; TEX. PENAL CODE ANN. § 6.01(a) (Vernon Supp.1990) ("A person commits an offense only if he voluntarily engages in conduct"). Thus, a jury should now be instructed to

acquit if the evidence raises any reasonable doubt that the defendant voluntarily engaged in the conduct charged. *George*, 681 S.W.2d at 45. However, the evidence raises a defense only if the defendant admits committing the act charged and the defense will absolve him from criminal responsibility for engaging in the conduct. *Sanders v. State*, 707 S.W.2d 78, 80 (Tex. Crim.App.1986). "Voluntariness" was not raised by the evidence because Appellant denied any act in connection with the fire. *See id.* Accordingly, the court properly refused to submit a defensive instruction on voluntariness because it was not raised by the evidence. *See George*, 681 S.W.2d at 47. Point three is overruled.

■ The State asserts in a cross-point that the court abused its discretion when it failed to conduct an indigency hearing before providing Appellant with a free statement of facts. Additionally, the State argues that Appellant was not indigent. This appeal was abated pending a hearing in the trial court on Appellant's indigency. This court has since been furnished a complete record of the evidentiary hearing, including findings of fact and conclusions of law, and will now consider the cross-point as if no erroneous action had occurred. *See* TEX. R.APP.P. 81(a).

At the evidentiary hearing the parties stipulated that Appellant had filed an affidavit of indigency, that the facts recited therein were and remain true, and that he was indigent at the time of the appeal. Based on these stipulations and the record as a whole, the court did not abuse its discretion when it ordered that he be provided a statement of facts without cost. *See Rosales v. State*, 748 S.W.2d 451, 455 (Tex.Crim.App.1987) (holding that an indigency finding will not be disturbed on appeal except for an abuse of discretion). The cross-point is overruled and the judgment is affirmed.