COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

ALEJANDRO LEDESMA, JR.,                            )

                                                                              )             
No.  08-04-00043-CR

Appellant,                          )

                                                                              )                   Appeal from the

v.                                                                           )

                                                                              )                
41st District Court

THE STATE OF TEXAS,                                     )

                                                                              )           
of El Paso County, Texas

Appellee.                           )

                                                                              )              
(TC# 20000D04485)

 

 

O
P I N I O N

 

Alejandro Ledesma,
Jr. was indicted on two counts for the murder of his first wife, Melina
Ledesma.  Prior to trial, the State
abandoned Count I and proceeded to trial only on Count II, which alleged that
Appellant had intentionally and knowingly caused the death of Melina Ledesma by
killing her in a manner unknown to the grand jury.  Count II also alleged that Appellant had used
a deadly weapon, unknown to the grand jury, during the commission of the
offense.  Over Appellant=s not guilty plea, the jury found
Appellant guilty of murder as alleged in Count II of the indictment and made an
affirmative deadly weapon finding.  The
jury then assessed punishment at 60 years=
imprisonment and a $10,000 fine.  In his
out-of-time appeal, Appellant contends that the evidence is legally and
factually insufficient to sustain his conviction and asserts that the trial
court erred by commenting on the weight of the evidence, which resulted in an
unfair trial.  We find no reversible
error and affirm.








In July 1993,
Melina Ledesma (AMelina@) was seventeen years= old and just graduated from high
school.  Melina and Appellant married on
June 18, 1993 and lived together in Appellant=s
house at 3107 Hamilton with Appellant=s
brother and father.  Both Melina and
Appellant worked at a garment finishing factory owned by Melina=s parents, Juan and Rosario Garcia, and
her aunt.

William Barrett
was a good friend of Appellant=s.  Mr. Barrett met Melina through
Appellant.  On July 27, 1993, Appellant
called Mr. Barrett and invited him to go out drinking with him and Melina.  They picked him up at his house, purchased
some quarts of beer, and then went to the APost,@ a dirt lot near the Pershing gate
entrance to Fort Bliss.  They arrived at
the Post at approximately 9:30 p.m. 
Appellant=s
brother, Leo, was there with five or six of his friends.  Almost everyone there was drinking, including
Mr. Barrett, Appellant, and Melina.  The
atmosphere was pleasant, everyone seemed to be getting along great, and there
were no problems or arguments that night. 
Mr. Barrett and Melina left in Appellant=s
car to buy more beer, but could not because by then it was past the midnight
cutoff time for beer sales.  They
returned to the Post at approximately 12:15 or 12:20 a.m.  Around 12:30 a.m., everyone left and
Appellant and Melina gave Mr. Barrett a ride back to his home, which was only a
two to three minute drive from Appellant=s
house.  Appellant told Mr. Barrett that
he and Melina were going to go home and get something to eat.  According to Mr. Barrett, Melina appeared to
be in excellent physical condition and looked in good health.








The next day,
Appellant showed up for work without Melina. 
Since they normally came to work together, the Garcias asked Appellant
where Melina was.  Appellant told them
that on the night before, they had gone out drinking at the Post and then
returned home.  From there, they went to
Clicks to play pool.  When they arrived,
Clicks was about to close, so Appellant told Melina to wait in the car while he
went to see if they were really closing. 
Appellant went inside and used the restroom and when he came back,
Melina was not in the car.  Appellant saw
her talking to some friends and he tried to get her to invite those friends
back to their house.  Melina did not want
to go home, so he drove away and left her there.  Appellant, however, went back to Clicks and
saw Melina get into a red Corvette with a man. 
Appellant followed them in his car, but the Corvette was fast and got
away.  Appellant went home and waited for
Melina to come home.  Appellant told the
Garcias that was the last time he had seen Melina.

After Appellant
talked to the Garcias, Mrs. Garcia and Appellant went to look for Melina while
Mr. Garcia stayed at the factory.  They
first went to Appellant=s
house at 3107 Hamilton and spoke with Appellant=s
brother, Leo, who was there at the house. 
Mrs. Garcia entered the house and stood between the kitchen and the
den.  They stayed at Appellant=s house for about five minutes.  According to Mrs. Garcia, Appellant=s demeanor that morning was Anormal@
and he was not angry.  Appellant and Mrs.
Garcia next went to Appellant=s
grandmother=s house
where they stayed for two hours.  They
called the police from the grandmother=s
house.  When the police arrived they
filed a report.  As requested, Mrs.
Garcia waited seventy-two hours past the time of  Melina=s
disappearance before speaking with the police again.








The Garcias
continued their attempts to locate Melina. 
They hired Jay J. Armes, a private investigator; printed and distributed
flyers; talked to Melina=s
friends; contacted the newspaper and televisions stations in El Paso and
Juarez; went to the Juarez police station; talked with the governor of
Chihuahua; contacted the FBI; searched in El Paso themselves; and turned to
psychics as well, but to no avail. 
Appellant helped the Garcias distribute flyers at the mall, but never
provided them with any evidence, leads, or witnesses to corroborate his story
about what had happened at Clicks.

Two or three days
after Melina=s
disappearance, Appellant spoke with Mr. Barrett.  Mr. Barrett asked Appellant what
happened with Melina.  Appellant told him
that Melina had left him.  Appellant said
that he and Melina had gone to Clicks later in the evening because she still
wanted to party and they ran into some friends there.  Appellant wanted to go home, but Melina did
not.  Appellant told Mr. Barrett that
there were two cars in the Clicks parking lot--one with a group of friends and
a red Corvette with a guy.  Melina got
into the red Corvette and Appellant tried to follow them and then went home.








Detective Tony
Tabullo of the El Paso Police Department became involved in the case on July
29, 1993.  When Melina=s disappearance was first reported, it
was treated as Aan
attempt to locate@
case.  Detective Tabullo first spoke with
the Garcias and then spoke with Appellant separately.  Appellant told Detective Tabullo that on the
night of her disappearance, he and Melina were playing pool at Clicks.  Appellant went to the restroom and when he
came back, Melina was outside talking to a group of four girls and three guys.  Appellant got into his car and honked the
horn several times before Melina came to the car.  Appellant told her it was time to leave, but
she walked back to her friends. 
Appellant became a little angry and told her it was time to leave again,
but again she refused.  Melina then told
Appellant that she did not want to go with him because he was drunk.  Appellant finally told Melina to choose
between him and her friends and she walked away and went to her friends.  Appellant became angry and jealous, so he
left the Clicks parking lot, hoping that perhaps Melina would come to him
before he left, but she did not. 
Appellant drove away, but then turned around and went back to pick up
Melina.  When he arrived, he saw Melina
getting into a red Corvette with a white convertible top.  Appellant described the driver of the
Corvette as AHispanic
male, 20 to 25 years old.  About five
foot six tall.  Short black hair and cut
off sideburns.  Wearing a white shirt,
blue jeans, white ostrich boots and looked like he had a beeper on him.@ 
Appellant followed the Corvette to I-10, but the Corvette sped up and
left him behind.  Appellant exited the
highway and went home.

Detective Tabullo
spoke with Appellant at least two other times and Appellant called him at least
once during the investigation.  Appellant
did not provide the police with any evidence, leads, or names of witnesses to
assist in locating Melina.  During their
investigation into Melina=s
disappearance, the police distributed police bulletins among law enforcement
agencies and the news media; investigated several traces that had been placed
on the Garcias= and
Appellant=s mother=s telephones; investigated sightings of
red Corvettes; placed Melina=s
information on the National Crime Information Computer (NCIC) system; spoke
with Melina=s and
Appellant=s
friends; went out to the Post; and placed Melina=s
information and photograph in the Missing and Exploited Childrens= Network.  Over the course of the next seven years,
Detective Tabullo spoke with the Garcias over a hundred times.  Records from the Social Security
Administration showed no activity on Melina=s
social security number after 1993.








On August 2, 1993,
the Garcias retained Jay J. Armes, a private investigator to investigate the
disappearance of their daughter. 
Appellant was with the Garcias for the initial meeting.  Mr. Armes questioned Appellant
separately.  Appellant told Mr. Armes
that he and Melina had a heated argument at their house on Hamilton about not
having food or heat in the house.  After
the argument, they decided to go play pool at Clicks.  He, Melina, and their friend Billy, got into
the car and left their house on Hamilton. 
During the drive to Clicks, Appellant and Melina continued to argue and
Billy asked to be let off so he could walk home.  They arrived at midnight and it looked like
Clicks was closed.  Appellant left Melina
in the car and went to the door to see if it was closed.  Appellant knocked on the window and a Clicks= employee told him they were
closed.  Appellant asked to use the
restroom and was allowed inside.  When he
returned to his car a few minutes later, Melina was gone.  Appellant saw Melina across the parking lot
talking to two men and a woman.  Melina
jumped into a red Corvette convertible with the individuals.  Appellant pursued the Corvette, but he could
not keep up and lost sight of it on Montana. 
Appellant obtained a partial license plate number.  Appellant drove around looking for the
Corvette at different club locations until two or three in the morning and then
went home.

Mr. Armes was
never able to confirm Appellant=s
story about Clicks, and Appellant never provided any witnesses or leads to
corroborate his version of events.  Mr.
Armes went to Clicks at midnight, one week after Melina=s
disappearance, to talk to customers and employees who might have seen Appellant
or Melina there.  Mr. Armes learned that
Clicks was open until 2 a.m.  Mr. Armes
also attempted to locate the red Corvette using the Department of Public Safety=s computer system, but never found the
red Corvette that was involved in the Clicks incident.  The Garcias and Appellant provided leads to
Mr. Armes, which took him to different parts of the country and Mexico.  His investigation remained active for over
two months, but he was never able to locate Melina.








Mr. Armes went to
Appellant=s house
on August 2, 1993, the same day he was retained.  He recalled that there was a young boy,
fourteen or fifteen years=
old, at the house named Leo.  There was
also a large dog, a Great Dane, inside the house.[1]  Mr. Armes visited the house four times.  The second visit was on the day following his
initial visit.  Mr. Armes noticed that
the dog was no longer there.  Appellant
told him that Leo had left the door open and the dog had run away.  Appellant said that the dog was probably
looking for Melina because it was her dog. 
Mr. Armes never went into the backyard of Appellant=s house.  

In June 2000, the
police received a tip from someone in federal custody that led them to
investigate Appellant=s
house at 3107 Hamilton.  On June 15,
2000, Officer Leticia Olivas of the El Paso Police Department=s crime scene unit was assigned the
duty of excavating the backyard at that address.  The officers began digging at approximately
11 a.m., using small garden shovels and paint brushes.  After a couple of hours, the officers decided
to bring in a small Bobcat to assist in the digging.  However, the Bobcat was not very effective
due to the rocky, caliche-type soil under the topsoil.  Around 3 p.m., they brought in a
backhoe.  At 9:50 p.m, a human skull was
unearthed.  The officers began digging in
the area using small hand trowels and paint brushes.  The skull and knees were approximately twelve
inches below ground level and the pelvic area was approximately seventeen
inches below ground level.  The feet were
approximately five inches below ground level. 
The skeletal remains were located approximately twenty-two feet from the
back door of the house.  White plastic
bags were recovered from the area around the skull and black plastic was found
throughout the grave site and underneath the skeletal remains.  Officers found a thick elastic band that they
believed to be a waistband, but no other indications of clothing were
recovered.








Several pieces of
jewelry were located with the skeleton. 
Mrs. Garcia identified the jewelry as items belonging to her daughter
Melina.  One of the rings had her
daughter=s
initials on it.  Mrs. Garcia also
testified that her daughter was five feet, four inches tall, Amore or less.@

Officer Olivas
collected four teeth and a small piece of bone from the medical examiner to
submit for DNA testing.  She also
obtained a hairbrush that had belonged to Melina.  A forensic biologist from the Department of
Public Safety conducted comparative DNA tests on the items.  He determined that the DNA profile generated
from the teeth matched the DNA profile generated from the hair on the
hairbrush.

Because the body
consisted of dry bones, Dr. Juan Contin, the medical examiner, examined the
body with Dr. Harrell Gil-King, a forensic anthropologist.  They determined that the skeleton was a
female of Hispanic, Mexican, or Latin descent, sixteen to eighteen years= old, and five feet one inch, to five
feet three and a half inches in height. 
They estimated her time of death was five to ten years earlier.  There was no evidence of injury, that is,
there was no evidence to explain the cause of death.  Dr. Gil-King noted that there may have been
soft-tissue injuries, such as hematoma, bruising, and abrasions, but they did
not find any injuries to the bones themselves.








In his report, Dr.
Contin concluded that the manner of death was homicidal.  Dr. Contin based his opinion on the
circumstances of the case, including the fact that the young woman was found
buried in the backyard.  Dr. Contin testified
that when a healthy person is killed by another, rather than by accident,
natural causes, or suicide, death could occur in many different ways, including
stabbing, beating, strangulation, suffocation, poisoning, or asphyxiation, all
of which would involve the use of a deadly weapon.  The foreman of the grand jury that indicted
Appellant testified that the grand jury was unable to determine the manner and
means of Melina=s
death.  The grand jury was also unable to
determine the type of weapon used to kill her.

In Issues One and
Two, Appellant contends that the evidence was legally and factually
insufficient to sustain his conviction. 
Specifically, Appellant asserts that the State failed to prove that
Melina was murdered or that he committed the murder.  Further, Appellant asserts that the State=s proof of guilt was so weak that it
undermines confidence in the verdict.

Standards
of Review

In reviewing the
legal sufficiency of the evidence, we must view the evidence in the light most
favorable to the verdict to determine whether any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
319, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); Hernandez v. State,
946 S.W.2d 108, 110-11 (Tex.App.--El Paso 1997, no pet.).  We do not resolve any conflict of fact, weigh
any evidence, or evaluate the credibility of any witnesses, as this was the
function of the trier of fact.  See
Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); Matson v.
State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991).  Instead, our duty is to determine whether if
both the explicit and implicit findings of the trier of fact are rational by
viewing all the evidence admitted at trial in the light most favorable to the
verdict.  See Adelman, 828 S.W.2d
at 421-22.  In so doing, any
inconsistencies in the evidence are resolved in favor of the verdict.  Matson, 819 S.W.2d at 843.








In reviewing the
factual sufficiency of the evidence, we must determine whether considering all
the evidence in a neutral light, the jury was rationally justified in finding
guilt beyond a reasonable doubt.  Zuniga
v. State, 144 S.W.3d 477, 484 (Tex.Crim.App. 2004). Evidence can be
factually insufficient if the evidence supporting the verdict, considered by
itself, is too weak to support the finding of guilt beyond a reasonable doubt,
or contrary evidence is so strong that guilt cannot be proven beyond a
reasonable doubt.  Zuniga, 144
S.W.3d at 484-85.  Our evaluation should
not intrude upon the fact finder=s
role as the sole judge of the weight and credibility given to any witness=s testimony.  Cain v. State, 958 S.W.2d 404, 407
(Tex.Crim.App. 1997).  We will not set
aside the judgment unless the evidence supporting the verdict is so weak as to
be clearly wrong and manifestly unjust.  Zuniga,
144 S.W.3d at 481.  A clearly wrong and
manifestly unjust verdict occurs where the jury=s
finding Ashocks
the conscience@ or Aclearly demonstrates bias.@ Id.  An opinion addressing factual sufficiency
must include a discussion of the most important and relevant evidence that
supports the appellant=s
complaint on appeal.  Sims v. State,
99 S.W.3d 600, 603 (Tex.Crim.App. 2003). 

Murder

A person commits
murder if he intentionally or knowingly causes the death of an individual.  See Tex.Pen.Code
Ann. '
19.02(b)(1)(Vernon 2003).  In this case,
Appellant was charged by indictment with the offense of murder, which alleged
on or about July 28, 1993, Appellant:

[D]id then and there intentionally and
knowingly cause the death of an individual, namely, MELINA LEDESMA by killing
the said MELINA LEDESMA in a manner unknown to the Grand Jury,

And it is further
presented that the said Defendant used and exhibited a deadly weapon,
to-wit:  a weapon unknown to the Grand
Jury, during the commission of and immediate flight from said offense . . . .

 








In a
circumstantial evidence case, the cumulative force of all the surrounding
additional facts and incriminating circumstances may be sufficient to support
the jury=s
conclusion of guilt.  See Barnes v.
State, 876 S.W.2d 316, 321 (Tex.Crim.App. 1994); Beardsley v. State,
738 S.W.2d 681, 685 (Tex.Crim.App. 1987). 
While Appellant acknowledges that the State presented a circumstantial
evidence case, he contends that the record is devoid of proof that he committed
the murder of Melina.  Specifically,
Appellant contends that the State failed to connect him to the crime of murder,
an element of the offense of murder, which the State must prove beyond a
reasonable doubt, even though it is no longer an element of the corpus delicti
of murder.  Further, Appellant argues that
the State also failed to prove that Melina was murdered. 

The corpus delicti
of murder is established if the evidence shows the death of a human being
caused by the criminal act of another.  McDuff
v. State, 939 S.W.2d 607, 614 (Tex.Crim.App. 1997); Fisher v. State,
851 S.W.2d 298, 303 (Tex.Crim.App. 1993). 
The corpus delicti may be established by circumstantial evidence.  Scott v. State, 732 S.W.2d 354, 358
(Tex.Crim.App. 1987).  

In this case, the
remains of the victim consisted of only dry bones.  DNA evidence was presented to identify the
victim as Melina.  There was also
evidence to show that the date of Melina=s
disappearance fell within the time of death of the body.  The medical experts found no evidence of injury
to the bones, therefore they could not explain the cause of death.  








Dr. Gil-King, however,
indicated that soft-tissue injuries could have occurred, which had not caused
injury to the bones.  Dr. Contin could
not determine the cause of death, but based on the facts and circumstances of
the case, namely that a healthy young woman was found buried in her backyard,
he opined that Melina=s
death was homicidal, that is, she was killed by another.  Dr. Contin testified that when a healthy
person is killed by another, death could occur in many different ways,
including stabbing, beating, strangulation, suffocation, poisoning, or
asphyxiation, all of which would involve the use of a deadly weapon.  Based on the testimony of the medical
experts, the jury could have reasonably concluded that Melina was killed in a
manner that did not cause skeletal injuries, but nevertheless involved a deadly
weapon and resulted in her death.

The State
presented circumstantial evidence to establish Appellant=s
identity as the perpetrator.  In
particular, the State presented the following surrounding facts and
incriminating circumstances to connect Appellant to the crime.  On the evening of July 27, 1993, Appellant
and Melina went out drinking with friends. 
After the night out, Mr. Barrett was dropped off at his home by
Appellant and Melina at approximately 12:35 a.m. on July 28.  Based on Mr. Barrett=s
account, he was the last person to see Melina alive.  Melina appeared in excellent physical
condition and looked in good health.

Around 8 a.m.,
Appellant showed up for work without Melina. 
Even though his wife was missing, Appellant=s
demeanor appeared normal on the first day Melina was missing.  Appellant helped the Garcias search for
Melina by distributing flyers at the mall, but never provided them with any
evidence, leads, or witnesses to corroborate his story about what had happened
at Clicks.  Appellant also did not
provide the police with any evidence, leads, or names of witnesses to assist in
locating Melina.  Mr. Armes, the private
investigator, was never able to confirm Appellant=s
story about Clicks.  On the contrary, Mr.
Armes discovered that Clicks was open until 2 a.m., not midnight as Appellant
had claimed.








On June 15, 2000,
police officers found Melina=s
body buried in Appellant=s
backyard.  At its deepest point, the
grave site was seventeen inches below ground level.  Melina was buried about twenty-two feet from
the back door of the house.  Except for
an elastic waistband, the police found no other indications of clothing on the
body.  The medical examiner determined
that the victim=s time of
death was five to ten years earlier. 
Social security records showed no activity on Melina=s social security number after
1993.  This evidence placed the time of
Melina=s death
near the time of her disappearance. 
Further, the jury could have reasonably inferred that Appellant had
access to his backyard, that others had limited access to his backyard, and
consequently, only Appellant could have killed Melina at the house and dug the
hidden shallow grave in the rocky ground. 

The sudden
disappearance of Melina=s
dog, a Great Dane named Tiger, was other incriminating evidence in this
case.  Mr. Barrett testified that Tiger
was a large dog and was normally kept in the backyard.  Only on rare occasions had Mr. Barrett seen
the dog inside the house.  However, on
August 2, 1993, Mr. Armes observed the dog inside the house.  The next day, Mr. Armes noticed that the dog
was gone.  Mr. Armes was told the dog ran
away.  The jury could have reasonably
inferred that Appellant removed the dog from the backyard so that the grave
site would remain undisturbed and got rid of the dog because it was too big to
keep in the house.  








Several witnesses
testified that according to Appellant, he and Melina went to Clicks, she ran
off with a man in a red Corvette, and he never saw her again.  However, there were inconsistencies in every
account Appellant gave of this story. 
Appellant told the Garcias that after drinking at the Post, he and
Melina returned home and then drove to Clicks because they wanted to play
pool.  Clicks was closing when he and
Melina arrived.  Appellant went inside to
use the restroom and when he returned he saw Melina getting into a red Corvette
with a man.  He tried to follow them, but
the Corvette sped away.  Appellant went
home and waited for Melina to come home. 
Appellant told a similar story to Mr. Barrett a few days later, except
he mentioned that two cars were involved, one with a groups of friends and the
other was a red Corvette with a guy. 
When Appellant was interviewed by Detective Tabullo on July 29, 1993,
however, he told the detective that he and Melina were inside playing pool at
Clicks before she went outside and left in the Corvette.  Appellant described the vehicle as a red
Corvette with a white convertible top. 
Appellant also provided a very detailed description of the driver.  Appellant also told Detective Tabullo that he
followed the Corvette until it sped away and then he went home.

When Appellant
spoke to Mr. Armes on August 2, he told a different version of events.  Mr. Armes testified that Appellant told him
that he and Melina had a heated argument and afterwards decided to go play pool
at Clicks.  Their friend Billy was with
them, but asked to be dropped off.  When
they arrived at Clicks at midnight, it was closing.  Appellant went in to use the restroom and
when he returned, he saw Melina getting into a red Corvette convertible with
two men and a woman.  Appellant said he
followed the car and obtained a partial license plate number.  Appellant also told Mr. Armes that he drove
around until 2 or 3 a.m. looking for the Corvette at different clubs before
going home.  According to Mr. Barrett, he
was with Melina and Appellant until 12:30 a.m., which was inconsistent with
what Appellant had told Mr. Armes.  Mr.
Armes attempted to confirm Appellant=s
story, but in his investigation, Mr. Armes discovered that Clicks did not close
at midnight and he was never able to locate the red Corvette.  








Viewing the
evidence in the light most favorable to the verdict, we find that from the
forceful circumstantial evidence presented, the jury reasonably and rationally
could have found the essential elements of the offense of murder beyond a
reasonable doubt.  Further, after
considering all the evidence in a neutral light, we conclude that the evidence
was not too weak to support the guilty finding beyond a reasonable doubt.  While Appellant offered a different version
of the events leading to Melina=s
disappearance, the jury chose to disbelieve this account.  See Cain, 958 S.W.2d at
407.  Accordingly, we conclude the
evidence was legally and factually sufficient to sustain Appellant=s conviction and overrule Issues One
and Two.

In Issue Three,
Appellant contends the trial court caused him to suffer an unfair trial by
commenting on the weight of the evidence. 
Specifically, Appellant asserts that the trial court=s comment, APeople
just don=t kill
themselves and go bury themselves, okay? 
I just don=t think
that=s a
normal thing that people do,@
violated due process by shifting the burden to the defense to disprove a
homicide.

During the State=s case-in-chief, Dr. Juan Contin, the
medical examiner, testified that although he could not determine the cause of
death, based on all the circumstances of the case, he concluded that the manner
of the victim=s death
was homicidal.  On cross-examination,
Dr. Contin explained that Ahomicidal
means that the person is killed at the hands of somebody else,@ and that on the death certificate, the
manner of death had to be listed as natural, accident, suicide, homicidal,
undetermined, or pending investigation. 
Defense counsel later asked Dr. Contin how he determined the death
was homicidal and the following exchange, in relevant part, occurred:

Defense:           If we don=t
know how this person died, how do we make the jump in logic that it was a
homicide?

 

Dr.
Contin:       It=s
purely circumstantially.  How often do
you see a young woman buried in the backyard?

 

Defense:           You don=t
see it very often, Doctor.

 

Dr.
Contin:       No. To me, it=s circumstantially.  It=s
homicide.

 








Defense:           Of course, do you ever know what you=re going to find in your backyard?  You see, I got a hole in mine last year.  I dug it up and there was a little septic
tank.

 

Dr.
Contin:       But this is the body of a
young woman.

 

Defense:           Well, I understand and I don=t mean it to be funny.  What I=m
saying is I understand that.  You find
skeletal remains in somebody=s
backyard, that is very unusual?

 

Dr.
Contin:       Yes.

 

Defense:           But does that make it a homicide?

 

Dr.
Contin:       Well, you see, I have the
decision to make based on the death certificate and that=s
my best conclusion.

 

Defense counsel then asked Dr.
Contin if it was just as likely that the victim=s
death was a suicide, when the circumstances, such as where the body was found,
were not considered.  The State objected
on relevancy grounds and the trial court sustained the objection.  The following exchange then occurred:

Defense:           If we exclude the circumstances
surrounding the recovery.  I=m asking you based upon what you
observed in your laboratory.

 

State:                Your honor, I=m going to object again.  Not only is it not relevant.  He=s
asking him to speculate.

 

Defense:           That=s
exactly what the DA asked him to do.  I=m just asking to speculate on [sic] a
different way.  I=m
sorry, Your Honor.

Judge, the whole
point here is surmise and speculation and I just believe I=m entitled to fully cross-examine him
on his speculation.  That=s all. 
Certainly, I can=t
be prevented from doing that.

 

The
Court:        Let=s
do it and get it over with.

 

Defense:           I=m
trying, Judge.

 








The
Court:        People don=t kill themselves and go bury
themselves, okay? I just don=t
think that=s a
normal thing that people do. 
[Emphasis added].

 

Immediately
following the court=s
comment, defense counsel approached the bench and objected to the statement as
a comment on the weight of the evidence and requested a mistrial.  The trial court overruled the objection.  After the recess, defense counsel asked Dr.
Contin if it was conceivable based on his examination of the skeletal remains
alone, that the body belonged to someone that died from a natural cause or
accidental overdose.  Dr. Contin agreed
that theoretically it was conceivable.

Article 38.05 of
the Texas Code of Criminal Procedure provides: 

In ruling upon the admissibility
of evidence, the judge shall not discuss or comment upon the weight of the same
or its bearing in the case, but shall simply decide whether or not it is
admissible; nor shall he, at any stage of the proceeding previous to the return
of the verdict, make any remark calculated to convey to the jury his opinion of
the case.

 

Tex.Code
Crim.Proc.Ann. art. 38.05 (Vernon 1979).

 








In Texas, trial
judges must refrain from making any remark calculated to convey to the jury his
opinion of the case.  Brown v. State,
122 S.W.3d 794, 798 (Tex.Crim.App. 2003), cert. denied, 541 U.S. 938,
124 S.Ct. 1678, 158 L.Ed.2d 359 (2004). 
As the Texas Court of Criminal Appeals explained in Brown, A>[j]urors
are prone to seize with alacrity upon any conduct or language of the trial
judge which they may interpret as shedding light upon his view of the weight of
the evidence, or the merits of the issues involved.=@ 
Id.  A trial court
improperly comments on the weight of the evidence if it makes a statement that
implies approval of the State=s
argument, indicates disbelief in the defense=s
position, or diminishes the credibility of the defense=s
approach to the case.  Clark v. State,
878 S.W.2d 224, 226 (Tex.App.--Dallas 1994, no pet.).

Here, the court=s comment occurred in the context of
ruling on the State=s
relevancy objection to Dr. Contin testifying as to the victim=s manner of death if he excluded the
surrounding circumstances.  The trial
court did not sustain the objection, rather the court stated, A[l]et=s
do it and get it over with.@  In making this ruling, however, the trial
court then remarked, APeople
don=t kill themselves and go bury
themselves, okay?  I just don=t think that=s
a normal thing that people do.@  Viewing the court=s
comment in light of the record, it appears that the court was merely making a
common-sense observation that people cannot kill themselves and bury
themselves.  However, the court=s comment was improper in that it does
indicate to some extent the court=s
disbelief in the relevancy of the particular question posed to the witness by
the defense.








Appellant asserts
that by the court=s comment
it stated its belief that Melina=s
death was by homicide and thus, the court impermissibly shifted the burden to
defense to disprove a homicide.  We
disagree.  A comment or instruction that
states a mandatory presumption violates due process by shifting the burden of
proof to a criminal defendant on a critical fact or element of the
offense.  See Brown, 122 S.W.3d at
799.  While the trial court=s comment could reasonably be regarded
as expressing doubt as to the defensive theory that Melina killed herself and
buried herself, the trial court=s
comment did not go so far as to express an opinion as to whether Melina was in
fact murdered.  Therefore, we cannot
agree that the court=s
comment created a mandatory presumption that Melina was murdered which then
Appellant had to rebut or that the court shifted the burden to Appellant to
prove that she was not murdered.  While
the court=s comment
was erroneous, it does not rise to the level of constitutional error because
there was no improper shifting of the burden of proof in violation of due
process.  See Watts v. State, 140
S.W.3d 860, 863 n.1 (Tex.App.--Houston [14th Dist.] 2004, pet. ref=d)(not every comment on the weight of
the evidence constitutes Aconstitutional
error@).

To constitute
reversible error in violation of Article 38.05, the comment in question must be
such that it is reasonably calculated to benefit the State or prejudice the
defendant=s
rights.  See Davis v. State, 651
S.W.2d 787, 789 (Tex.Crim.App. 1983); Minor v. State, 469 S.W.2d 579,
580 (Tex.Crim.App. 1971).  In evaluating
whether the court=s comment
on the evidence was reasonably calculated to benefit the State or prejudice the
defendant, the reviewing court first examines whether the trial court=s statement was material to the case; a
comment is material if the jury had the same issue before it.  Clark, 878 S.W.2d at 226.  Clearly, the manner of the victim=s death was a material issue for the
jury.  However, the court=s comment was not reasonably calculated
to benefit the State or to prejudice the defendant=s
rights.  By its comment, the court merely
expressed disbelief in the relevancy of excluding the particular circumstances
in a circumstantial evidence case.  Read
in its proper context, the comment neither benefitted the State nor prejudiced
the defendant.  

Moreover, under a
harm analysis under Rule 44.2(b) for non-constitutional error, we must
disregard the error if it does not affect Appellant=s
substantial rights.  See Tex.R.App.P. 44.2(b).  A criminal conviction should not be
overturned for non‑constitutional error if the appellate court, after
examining the record as a whole, has fair assurance that the error did not
influence the jury, or had but a slight effect. 
Johnson v. State, 967 S.W.2d 410, 417 (Tex.Crim.App. 1998); King
v. State, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997)(AA
substantial right is affected when the error had a substantial and injurious
effect or influence in determining the jury=s
verdict.@).  








Here, the error
was an isolated comment from the trial court during its ruling on the relevancy
of defense counsel=s
particular question to Dr. Contin, asking him to exclude the circumstances
surrounding the death.  Appellant
objected to the court=s
comment on the evidence and requested a mistrial, rather than an instruction to
disregard.  The trial court overruled the
objection.  Appellant then proceeded to
question Dr. Contin as to his opinion on the manner of death without considering
the surrounding circumstances.  Dr.
Contin agreed that it was conceivable that the victim=s
death was from a natural cause or an accidental overdose.  During his closing argument, defense counsel
stressed to the jury that Dr. Contin believed that the victim could have died
from natural causes or an accidental drug overdose.  In contrast, the State argued that Dr. Contin
ruled the death a homicide and had explained that a person does not end up
buried in someone=s
backyard if she dies of natural causes, accident, or disease.  Neither party mentioned the trial court=s previous comment, but we observe that
the manner of the victim=s
death was a central issue in the case. 
However, beyond Dr. Contin=s
testimony on the manner of death, there was other strong circumstantial
evidence presented that established Appellant=s
guilt.  After reviewing the record as a
whole, we have fair assurance that the error did not influence the jury, or had
but a slight effect of the jury=s
verdict, therefore we hold it was harmless. 
Issue Three is overruled.  

We affirm the
trial court=s
judgment.

 

December
1, 2005

DAVID WELLINGTON
CHEW, Justice

 

Before Barajas, C.J., McClure, and Chew, JJ.

 

(Do Not Publish)











[1]
According to Mr. Barrett, Appellant had a Great Dane named Tiger, which was
normally kept in the backyard.  Mr.
Barrett had visited Appellant=s
house ten to fifteen times and only on rare occasions had he seen the dog
inside the house.